IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER COOK, | ) | CASE NO. 1:20CV811 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DONALD C. NUGENT |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Christopher Cook ("Cook") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for supplemental security income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons explained below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I. Procedural History

Cook filed an application for SSI in May 2013, alleging a disability onset date of January 1, 2013.  Tr. 144.  He alleged disability based on the following: herniated disc in back, neck and shoulders.  Tr. 174.  After denials by the state agency initially (Tr. 74) and on reconsideration (Tr. 85), Cook requested an administrative hearing.  Tr. 105.  A hearing was held before an Administrative Law Judge ("ALJ") on July 23, 2015.  Tr. 22-62.  In his December 28, 2015, decision (Tr. 10-18), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Cook can perform, i.e., he is not disabled.  Tr. 17-18.  Cook requested

review of the ALJ's decision by the Appeals Council (Tr. 199-201) and, on September 17, 2016, the Appeals Council denied review.  Tr. 1-3.

Cook appealed to federal court and the parties stipulated to a remand, which was granted on May 18, 2017.  Tr. 490.  The Appeals Council issued a remand order on November 8, 2017.  Tr. 483-488.  The same ALJ held a second hearing on April 12, 2018.  Tr. 448-482.  On February 27, 2019, the ALJ issued another unfavorable decision.  Tr. 429-442.  Cook again requested review of the ALJ's decision by the Appeals Council (Tr. 420-422) and, on February 15, 2020, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 412-414.

## II. Evidence

### A.  Personal and Vocational Evidence

Cook was born in 1971 and was 42 years old on the date he filed his application.  Tr. 440. He has a high school education and used to work as a production assembler and a chrome plater. Tr. 29, 32.

### B.  Relevant Medical Evidence

Cook sustained a work-related injury on August 6, 2007, and was diagnosed with a sprain in his lumbar region and a herniated disc at L5-Sl.  Tr. 364.  He saw Dr. Morley, D.O., for treatment.  Tr. 368.  An August 2007 MRI of his lumbar spine showed an acute broad disc herniation at L5-Sl encroaching upon the neural foramina bilaterally and the exiting nerve roots, and spondylolisthesis at L5-Sl.  Tr. 319.

An EMG/NCV study of Cook's left leg in April 2008 was consistent with lower lumbar radiculopathy.  Tr. 315-316.  At a follow up with Dr. Morley, Cook was disinclined to undergo recommended steroid injections, and he was advised to continue stretching, exercise, and ice,

and his Oxycontin prescription was increased slightly for pain. Tr. 357. In June 2008, Cook reiterated that he did not want invasive treatment such as surgery or injections so Dr. Morley continued his medication and submitted a form for vocational rehabilitation. Tr. 357. At that time, Dr. Morley stated that Cook's treatment plan was vocational rehabilitation, no further surgery or diagnostic testing was planned, and that he was capable of returning to his previous work as a chrome plater in the same capacity as before by September 2008. Tr. 354.

In January 2012, Cook saw Dr. Morley complaining of neck, back, and right hip pain. Tr. 252. He reported that Oxycodone helped control his pain and allowed him to function. Most of his pain was in his lumbar region and he experienced occasional radiating pain down his legs. He denied any bowel or bladder incontinence. Upon exam, he had decreased lumber range of motion secondary to pain and a positive straight leg raise test at 40 degrees of hip flexion. His Oxycontin prescription was refilled and he was to continue his stretching and exercises.

In February 2012, Cook followed up with Dr. Morley after a consulting surgeon recommended a fusion procedure. Tr. 251. Cook was hesitant to undergo such a significant surgery because there was no guarantee that it would work. His pain was constant and radiating into his left leg. Dr. Morley refilled his medication.

In May 2012, Cook saw Dr. Morley and reported that his pain levels were quite high but, if he took his medication, he functioned well. Tr. 244. Upon exam, he had weakness in his right leg with hip flexion and positive straight leg raise testing at 40 degrees. In June, Cook told Dr. Morley that his pain was 6/10 and radiating from his back to his right leg. Tr. 244.

In September 2012, Cook saw Dr. Morley complaining of upper and lower back pain with low back pain occasionally radiating into legs, worse on the left, and upper back pain radiating into his trapezius. Upon exam, he had limited rotation through his cervical area and

right-sided spasm through his levator scapulae area.  Dr. Morley noted that his lumbar area was the location of more of his problems, and he had positive straight leg raise testing at 40 degrees on the left and decreased sensation in his left leg.  His Oxycodone was continued.

In November 2012, Cook followed up with Dr. Morley and stated that his pain was worse on the left and radiating into his leg.  Tr. 245.  The medication helped him function, and Dr. Morley refilled his Oxycodone.  In December 2012, Cook reported left-sided radicular pain and right-sided upper back pain.  Tr. 245.  Dr. Morley observed that he appeared to be in quite a bit of pain through his lumbar area, he had pain in his thigh with 45 degrees of flexion, and weakness with heel and toe walking.  His medication was continued.

In February 2013, Cook saw Dr. Morley and reported constant back pain and intermittent left-sided radicular pain.  Tr. 245.  In June 2013, Cook reported that his pain levels were still quite high.  Tr. 246.  His medication enabled him to function.  In July 2013, Cook reported pain radiating down his left leg and trouble sitting or standing for a prolonged period of time.  Tr. 246.  Upon exam, he had positive straight leg raise testing on the left at 30 degrees of hip flexion, intact sensation, and his reflexes were 1/4 bilaterally in the lower extremities.  His medication was continued.

On October 1, 2013, Cook had left lower lumbar pain upon palpation, and he could flex 40 degrees, extend 10 degrees, and bend sideways 15 degrees.  Tr. 246.  He had positive straight leg raise testing at 30 degrees.  On October 30, he had stiffness in his back which he attributed to the cold weather.  Tr. 246.  He reported chronic pain radiating down his left leg.  He stated that Oxycodone kept his pain level constant and allowed him to function and get through his day.  In November, Cook's symptoms were the "same as usual" and he had antalgic gait and bilateral lower lumbar pain on palpation, worse on the left.  Tr. 246.  His range of motion was stable and

his medication was continued.

In February 2014, Cook saw Dr. Morley complaining of pain in his lower back and down his left leg. Tr. 244. He had trouble sitting and standing for more than 10 minutes at a time, going up and down stairs, and sleeping. Upon exam, he had tenderness in his lumbar spine, worse on the left, and a positive straight leg raise test on the left at 40 degrees. He could flex 30-40 degrees, extend 5-10 degrees, and bend sideways about 10 degrees.

In May 2014, Cook saw Dr. Morley complaining of pain in his back and down his left leg. Tr. 243. Upon exam, he could flex his lumbar spine about 40 degrees and extend 15 degrees. He had an antalgic gait and a positive straight leg raise test on the left at 40 degrees. His Oxycodone was refilled. In July 2014, Cook reported pain across his low back and radicular symptoms through his left leg and trouble going up and down stairs and sitting and standing for a long period of time. Tr. 243. His medication allowed him to function day to day and he had been trying to do some home exercises and stretching. Upon exam, he had tenderness in his lower lumbar spine on the left and some spasm, and positive straight leg raise testing on the left. He could flex his lumbar spine about 40-50 degrees and extend 15-20 degrees. Cook asked Dr. Morley to increase his Oxycodone prescription to allow him to take a pill three times a day, as he had been taking three pills a day sometimes. Dr. Morley advised that that was "not the best idea" and stated, "we are going to leave him as is [one 30-mg tablet every twelve hours as needed]," and gave Cook 60 tablets with no refills. He commented that, if Cook required higher dosing, then a pain management consultation may be initiated. The next month, Cook advised that he was planning on seeing pain management; he continued to follow up with Dr. Morley and Dr. Morley refilled his Oxycodone prescription. Tr. 243.

In January 2015, Cook saw Dr. Morley stating that he still had discomfort, his pain was

6/10, and it radiated from his lumbar area to his legs. Tr. 411. Dr. Morley reviewed his chart showing disc herniations and spondylolisthesis at L4-L5. They discussed Cook's options, and Dr. Morley wrote that, at this point, Cook's medications enabled him to function and "[h]e is going to continue to treat conservatively with the medications." He was to continue stretching, strengthening exercises, and using ice, and Dr. Morley refilled his Oxycodone.

In March 2015, Cook saw Dr. Morley reporting constant low back pain radiating to his legs. Tr. 410. He rated his pain as 6/10, which, Dr. Morley noted, was his baseline. Upon exam, he had moderate guarding on palpation in his lumbar area, midline pain with extension, and positive straight leg raise testing at 40 degrees bilaterally. In May 2015, Cook complained of dull, aching pain in the lower back and he had pain on palpation and with movement. Tr. 410. In July 2015, he had some lumbar spasm present. Tr. 410.

In June 2017, Cook was discharged from physical therapy after six out of six visits. Tr. 607. That day he was "coming straight from work, and subsequently is feeling increased soreness in his low back." He rated his pain 7/10. He reported no change in his symptoms since therapy began, although he reported some relief with exercises but that it only lasts 30 minutes. Upon exam, his lumbar flexion and side bend was within normal limits and he had a moderate limitation with extension. Since his initial visit, the sensation in his left leg had improved and his tenderness upon palpation had remained the same. Tr. 608. He met his goal of increasing his strength to -4/5 in his bilateral lower extremities. Tr. 609. The therapist concluded that Cook "has not improved subjectively since initiating physical therapy, however, his Oswestry has improved from 66 to 52. His pain complaints have remained unchanged. He does experience some symptom relief with therapy but carry over is very poor." Tr. 608.

In July 2017, Cook had an MRI of his lumbosacral spine. Tr. 605-606. The MRI showed

moderate to severe loss of intervertebral disc height, progressed, at L4-L5, with Type I
degenerative endplate changes, grade I anterolisthesis with diffuse disc bulge/uncovering, and no
significant spinal canal narrowing.  "The anterolisthesis and disc bulge/uncovering and facet
hypertrophy result in severe right and severe left neural foraminal narrowing, not significantly
changed."

In January 2018, Cook visited a provider at Pain and Functional Medicine and reported
increased pain in his lumbar spine and shoulders.  Tr. 580.  He was working a lot.  Cold weather
and repetitive motion exacerbated his pain.  His increased Oxycodone dose was helpful.

### C. Opinion Evidence

#### 1. Treating Source

On August 5, 2013, Dr. Morley completed a Statement of Ability to do Work-Related
Activities on behalf of Cook.  Tr. 227-232.  Dr. Morley opined that Cook could frequently
lift/carry up to 10 pounds, occasionally lift/carry up to 20 pounds, and could never lift/carry
more than 20 pounds.  He could sit, stand, and walk for up to 30 minutes at a time without
interruption, and perform each of those acts for five hours a day.  He did not require the use of a
cane to ambulate.  He could occasionally climb ramps and stairs, never climb ladders or
scaffolds, frequently balance and stoop, and occasionally kneel, crouch and crawl.  He could
have no exposure to unprotected heights.

#### 2. Consultative Examiner

In December 2012, Cook saw Dr. Bradford, M.D., for a consultative examination.  Tr.
212-219.  Testing revealed decreased cervical spine flexion, extension and rotation and reduced
range of motion in his dorsolumbar spine.  Cook reported pain that radiated up his back and
down the back of his right leg to his knee.  The pain came when he sat or stood for 30 minutes.

He sometimes used a cane in his left hand if his pain got really bad and his left leg got weak. He was prescribed Oxycodone. Dr. Bradford concluded that Cook was a 41-year-old with lumbar disk disease and left lower extremity radiculopathy. Upon exam he had left lower extremity weakness, 4/5, and his gait was antalgic favoring the right. He did not appear to be at risk of falls, he did not use an ambulatory aid, and, in Dr. Bradford's opinion, he should be restricted to sedentary activity.

In September 2013, Cook saw Dr. Bradford for a second consultative exam. Tr. 234-241. His testing and exam findings were similar to his prior exam, and Dr. Bradford again opined that Cook should be restricted to sedentary activity.

### 3. State Agency Reviewing Physicians

In September 2013, state agency reviewing physician Dr. Das, M.D., reviewed Cook's records. Tr. 69-71. Regarding his RFC assessment, Dr. Das opined that Cook could perform light work, limited to standing and/or walking 4 hours a day and limited to occasional push/pull using his left lower extremity, occasional climbing of ramps/stairs, never climbing ladders/ropes/scaffolds, occasional balancing, stooping, kneeling, crouching and crawling, and avoiding all exposure to hazardous heights and machinery. In February 2014, Dr. Bertani, M.D., adopted Dr. Das's findings. Tr. 81-82.

### D. Testimonial Evidence

### 1. Cook's Testimony

Cook was represented by counsel and testified at both administrative hearings.

July 2015 hearing: Cook testified that he injured his back while working in 2007. Tr. 34. He has had back pain since then, primarily in his low back. Tr. 34-36. On a typical day, with medication, his pain is 7/10. Tr. 36. His back pain intermittently radiates to his left leg and goes

all the way down to his toes.  Tr. 37-38.  It feels like numbness and tingling.  Tr. 38.  At the hearing he had a cane, which had not been prescribed to him; rather, his mother had given it to him a couple of months prior to the hearing.  Tr. 36.

When asked how much weight he can lift, Cook stated that he can lift up to 10 pounds. Tr. 39.  If he lifts more than that his low back starts to hurt.  Tr. 39.  He does not exercise but tries to do some walking up and down the street a little bit to stay active.  Tr. 29.  He can walk about 15 minutes before he needs to take a break.  Tr. 39.  He can sit for 15 minutes and then he has to stand up.  Tr. 40, 46.  When he sits, there is constant pressure in his low back.  Tr. 47.  He can stand for about 10 minutes and then he has to sit down.  Tr. 47.

Cook does not have a driver's license.  Tr. 29.  He lives with his mother and, to help around the house, he can wipe down tables and do a little bit of vacuuming.  Tr. 40.  He can prepare quick meals and he can't do laundry or go grocery shopping.  Tr. 41.  He can't carry anything up and down the stairs or take out trash.  Tr. 40.  His bedroom is on the second floor. Tr. 40.  When asked about records from Dr. Morley's office in which Cook stated that he functions well when he takes his pain medication, Cook agreed that, when he takes his pain medication, he can get out of bed and walk a little bit.  Tr. 40-41.  If he doesn't take his pain medication, he might be confined to his bed.  Tr. 41.  When asked if that has ever happened, Cook answered that it had happened that morning, but he knew he had to get up and come to the hearing.  Tr. 41.

On a typical day, Cook gets up and tries to do some exercises with two-pound weights. Tr. 42.  He tries to walk to keep his legs strong.  Tr. 42.  He naps a lot during the day and does not sleep well at night; he is constantly moving trying to get comfortable.  Tr. 42.  A surgeon had recommended lumbar fusion surgery but Cook was not interested.  Tr. 42, 45.  He was scared

because people had warned him that there was no way to know how a back surgery will turn out. Tr. 45.  When asked about his ability to go up and down stairs, Cook stated that, when he is on his medication, he can "maybe" do one flight of stairs; "maybe not" do two flights of stairs; and three flights is impossible.  Tr. 45.  At home, he goes up and down stairs once a day.  Tr. 45.

.    April 2018 hearing: Cook testified that his major impairment is a disc problem in his low back.  Tr. 457.  It affects his ability to bend, stand and sit for long periods, and exercise.  Tr. 457. Those actions cause him pain; it starts in his low back and radiates down his left leg to his toes. Tr. 457.  The pain is constant.  Tr. 457.  On a typical day, his pain is 8.5/10.  Tr. 458.  When he does any activity whatsoever his pain starts radiating upwards into his shoulders, and some days it gets worse than 8.5/10.  Tr. 458.  Cold weather and rain make it worse; hot and humid weather makes it slightly better.  Tr. 458.  He takes Oxycodone for his pain.  Tr. 458-459.  The Oxycodone makes it possible for him to move around for more than 30 minutes and reduces his pain from 8.5 to 3/10.  Tr. 459.  That lasts for about 3-4 hours, and he is permitted to only take 3 pills a day, so his pills don't cover the whole day.  Tr. 459.  He tried physical therapy but it did not help.  Tr. 463.

Cook stated that he can sit for about 25-30 minutes and then he gets a burning sensation in his low back.  Tr. 459-460.  Then he stands or walks around for 10-15 minutes.  Tr. 460.  He is able to stand in one place for 25-30 minutes and then he has to sit down due to numbness and pain radiating into both legs.  Tr. 460.  He has not fallen; he can feel a fall coming on and, when he does, he sits down.  Tr. 460.  Lying on his side is comfortable for him.  Tr. 461.  He does not sleep well.  Tr. 461.  He can no longer climb stairs; he has moved everything downstairs to one floor.  Tr. 462.

When Cook takes his pain medication and his pain is at a 3/10 level, he is able to do

typical activities of daily living.  Tr. 466-467.  He lives with his wife and two children, ages 11 and 13.  Tr. 467.  He takes care of the kids.  Tr. 467.  He washes dishes for about 10-15 minutes and helps his wife cook.  Tr. 467-468.  He doesn't do laundry because he can't go downstairs.  Tr. 468.  He does not go grocery shopping because "that's a lot of walking."  Tr. 468.  He does some exercises with a 5-pound weight and lies on his back and paddles his legs.  Tr. 468-469.

At the hearing, Cook did not have a cane as he did at the first hearing.  Tr. 471.  He stated that over the last few months his legs have gotten stronger and he is feeling a little bit better.  Tr. 471.

### 3.  Vocational Expert's Testimony

A Vocational Expert ("VE") testified at both hearings.  At the second hearing, the ALJ asked the VE to determine whether a hypothetical individual of Cook's vocational profile could perform work if that person had the limitations subsequently assessed in the ALJ's RFC determination, described below.  The VE answered that such an individual could perform the following jobs that exist in significant numbers in the national economy: cashier II, ticket seller, and order caller.  Tr. 473-477.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in

11

the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

## IV. The ALJ's Decision

In his February 27, 2019, decision, the ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since May 13, 2013, the application date.  Tr. 432.

2.    The claimant has the following severe impairment: lumbar degenerative disc disease with left radiculopathy.  Tr. 432.

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 433.

4.    The claimant has the residual functional capacity to perform light work, as defined in 20 CFR 416.967(b), except he can stand and/or walk for a total of four hours in an eight-hour workday, i.e., meaning he should be afforded the opportunity to alternate positions between standing and sitting at approximately 30-minute intervals; he can occasionally push/pull with the left lower extremity; he can never climb ladders, ropes or scaffolds; he can occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl; he should avoid concentrated exposure to temperature extremes and humidity; and he should avoid concentrated exposure to hazards, such as dangerous machinery and unprotected heights.  Tr. 435.

5.    The claimant is unable to perform any past relevant work.  Tr. 439.

6.    The claimant was born in 1971 and was 42 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  Tr. 440.

7.    The claimant has at least a high school education and is able to communicate in English.  Tr. 440.

8.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.  Tr. 440.

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 440.

10.    The claimant has not been under a disability, as defined in the Social Security Act, since May 13, 2013, the date the application was filed.  Tr. 442.

## V. Plaintiff's Arguments

Cook argues that the ALJ erred at step three when he evaluated whether Cook's back impairment met or equaled a listing; when he evaluated Cook's symptoms, including pain; and when he did not adequately explain the weight he gave to the opinion evidence.  Doc. 14, pp. 1, 16-22.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### 1. The Appeals Council's remand order

As an initial matter, Cook asserts that the ALJ failed to comply with the Appeals Council's remand order.  Doc. 14, pp. 14-16.  The undersigned notes that Cook has not actually argued that remand is warranted based upon the ALJ's alleged failure.  *See id*. (stating that the Sixth Circuit has not decided the issue of whether district courts have jurisdiction to entertain a claim that the ALJ failed to follow an Appeals Council's order on remand and collecting cases indicating that circuit courts and district courts within the Sixth Circuit are split on the issue).

This Court need not decide that issue because, assuming, *arguendo*, that Cook has properly presented this issue to the Court, the undersigned finds that the ALJ did not violate the Appeals Council's remand order, as explained more fully below.

### 2. The ALJ did not err at step three

At step three of the disability evaluation process, a claimant will be found disabled if his impairment(s) meets or equals one of the listings in the Listing of Impairments.  20 C.F.R. § 404.1520(a)(4)(iii).  The claimant bears the burden of establishing that his condition meets or equals a listing.  *Thacker v. Soc. Sec. Admin.*, 93 Fed. App'x 725, 727-728 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)).  Thus, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."  *Thacker*, 93 Fed. App'x at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)).  "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant "must satisfy all the criteria to meet the listing."  *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x 411, 414 (6th Cir. 2011) (internal quotation marks omitted).

Cook argues that the ALJ erred at step three when he evaluated whether Cook's back impairment met or equaled Listing 1.04(A).  Doc. 14, pp. 16-17.  Listing 1.04(A) is,

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> > A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)….

20 C.F.R. Pt. 404, Subpt. P, App. 1.

The ALJ thoroughly discussed whether Cook's impairment met or equaled Listing

1.04(A) (Tr. 433-435).  The ALJ observed that no acceptable medical source had opined that

Cook equaled Listing 1.04(A), and the ALJ found all of the following:

Prior to Cook's alleged onset date:
- Cook was diagnosed with a lumbar sprain and herniated disc at L5-S1 after suffering a work-related injury in 2007;
- A 2007 MRI showed an acute broad-based disc herniation at L5-S1 affecting neural foraminal narrowing and spondylolisthesis;
- A 2008 EMG/NCV showed lumbar radiculopathy;
- He was treated conservatively in 2007-2008 by Dr. Morley with ice, stretching, exercises, pain medication, physical therapy, and vocational rehabilitation;
- He reported his left leg gave way occasionally but he had not had any falls and he was not prescribed a cane, suggesting that he did not have the requisite weakness as described in Listing 1.04(A);
- Ten months after his injury, in June 2008, Dr. Morley opined that he didn't need surgery or additional diagnostic testing;
- In early 2012, Cook reported to Dr. Morley that a surgeon had suggested lumbar fusion surgery but Cook did not want to pursue it;
- In early 2012, Cook reported that his Oxycodone helped him control the pain and allowed him to function;
- In early 2012, most of his pain was in his lumbar region and he denied incontinence, which would have suggested muscle weakness;
- In early 2012, although Cook had a positive straight leg raise test at 40 degrees, he reported only occasional radiating pain down his leg, diminishing the evidentiary support for satisfying Listing 1.04(A);
- And in early 2012, eight months prior to his alleged onset date, he reported that his pain levels were quite high but he also stated that he functioned well when he took his medication.

After his alleged onset date of January 1, 2013:
- Cook continued to receive the same, conservative treatment as before;
- He had trouble sitting and standing for long periods of time, but Oxycodone helped control his symptoms and get him through his day;
- In November 2013 he had an antalgic gait but was walking without an assistive device;
- In July 2014 he began asking Dr. Morley for an increase in his prescription and stated that he was sometimes taking three pills a day, but Dr. Morley declined to increase his prescription and kept him on two pills, twice a day, every 12 hours as needed; and
- In January 2015, Dr. Morley wrote that Cook's medications enable him to function and stated, "He is going to continue to treat conservatively with the medications" as

prescribed and continue stretching, strengthening exercises, and use of heat and ice to manage pain.

Tr. 433-435.

Cook complains that the ALJ paid "lip service" to the elements of Listing 1.04 but ignored evidence "that lends support" to Cook's claim that he met or equaled Listing 1.04. Doc. 14, p. 17. However, the ALJ discussed the elements of Listing 1.04(A), including neuro-anatomic distribution of pain, motor loss, and positive straight-leg raise testing, and found that the evidence did not show that Cook met or equaled Listing 1.04(A). Cook does not identify evidence in the record of positive straight leg raise testing in the sitting and supine positions, as required in Listing 1.04(A), nor has he shown evidence of motor loss to overcome the ALJ's finding that any alleged motor loss did not rise to a listing level because Cook's radicular pain complaints were intermittent, he had not had any falls, and he was not prescribed, nor did he utilize, an assistive device. Thus, he has not met his burden of establishing that his condition meets or equals Listing 1.04(A). *Thacker*, 93 Fed. App'x at 727-728. In short, substantial evidence supports the ALJ's step three finding.

Cook complains that the ALJ relied too heavily on Cook's longtime treatment with Oxycodone and "seemed to be asserting that Mr. Cook's use of Oxycodone, and request for more, was a drug-seeking behavior rather than an attempt at pain relief." Doc. 14, p. 17. The undersigned disagrees; the ALJ expressly stated that he relied on the fact that Cook's use of Oxycodone had not changed over the many years he received treatment for his injury, his use of it was labeled "conservative" by his prescribing physician, and he had repeatedly stated that it enabled him to function.

Finally, to the extent that Cook asserts that the ALJ did not follow the Appeals Council's remand order instructing the ALJ to give further consideration to the question whether Cook met

or equaled Listing 1.04 (Tr. 488), the undersigned finds that the ALJ gave sufficient

consideration to the question whether Cook met or equaled Listing 1.04.

### 3. The ALJ did not err when evaluating Cook's statements about his symptoms

Cook argues that the ALJ erred when evaluating Cook's statements about his symptoms.

Doc. 14, p. 18. He contends that the ALJ "appeared to rely primarily on two factors for rejecting

Mr. Cook's allegations of disabling pain—alleged noncompliance with treatment and statements

from Mr. Cook that he could function when on his pain medication." Doc. 14, p. 18.

A claimant's statements of pain or other symptoms alone are not sufficient to establish

the existence of a physical or mental impairment or disability. 20 C.F.R. § 404.1529(a); SSR 16-

3p, 2017 WL 5180304. When a claimant alleges impairment-related symptoms, a two-step

process is used to evaluate those symptoms. 20 C.F.R. § 404.1529(c); 2017 WL 5180304, *2-8.

First, a determination is made as to whether there is an underlying medically determinable

physical or mental impairment that could reasonably be expected to produce the claimant's

symptoms, e.g., pain. *Id*., *3-4. Second, once the foregoing is demonstrated, an evaluation of the

intensity and persistence of the claimant's symptoms is necessary to determine the extent to

which the symptoms limit the claimant's ability to perform work-related activities. *Id*. at *3, 5-8.

To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along

with the objective medical evidence, information from medical and non-medical sources,

treatment received, and other evidence. *Id*. In addition to this evidence, the factors set forth in

20 C.F.R. 404.1529(c)(3) are considered: daily activities; location, duration, frequency, and

intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type,

dosage, effectiveness, and side effects of any medication taken to alleviate pain or other

symptoms; treatment, other than medication for relief of pain or other symptoms; measures other

than treatment a claimant uses to relieve pain or other symptoms, e.g., lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms. *Id*. at *7-8. The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id*. at *10.

"An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec*., 437 Fed. App'x 370, 371 (6th Cir. 2011) (citing *Walters*, 127 F.3d at 531).

Here, the ALJ found that Cook's allegations that his impairments precluded him from all work was not consistent with the evidence of record. Tr. 436. The ALJ itemized the factors in SSR 16-3p. The ALJ accurately observed that Cook had had a "relatively unchanged treatment regimen" for his impairments. The ALJ remarked that, although Cook had requested increased Oxycodone, Dr. Morley had repeatedly kept Cook on the same medication dosage (and other conservative treatment modalities) for years, indicating that the amount of medication Cook was prescribed was deemed by Mr. Morley to be at an optimal level. Tr. 437. The ALJ noted that Cook had refused to undergo fusion surgery. He repeatedly told Dr. Morley that Oxycodone helped him function. He had not been prescribed a cane nor did he regularly use a cane, indicating that his impairments had not worsened during the adjudication period. SSR 16-3p, 2017 WL 5180304 (an ALJ considers treatment, including medications, that the claimant has received).

The ALJ commented that a physical therapy note from June 2017 stated that Cook had just come from work and, as a result, was feeling increased soreness in his low back.  Tr. 437.  The ALJ found that this evidence was significant for two reasons.  First, it bolstered the evidence of record showing that Cook can perform work within the scope of the assessed RFC.  Second, it showed that Cook had improved with physical therapy despite his assertions that he had not improved.  The ALJ observed that the physical therapist stated that Cook "has not improved subjectively since initiating physical therapy, however, his Oswestry has improved from 66 to 52.  His pain complaints have remained unchanged.  He does experience some symptom relief with therapy but carry over is very poor."  Tr. 437.

Cook concedes that the record indicates that he stated that he could function well and get through the day on his pain medication (his pain level was reduced to 3/10), but argues that his ability to get through the day did not mean he was pain-free or able to work.  Doc. 14, p. 19.  But, as the ALJ observed, Cook had been working.  See also Tr. 602, 604 (working 10 hours a day as a janitor); Tr. 584 (low back pain increased by "working outside in the cold"); Tr. 590 (working 5-7 days a week); Tr. 592 (missed a day of work after a hard day of "working for two people" but feeling "pretty good" that day); Tr. 594 ("unable to come to [illegible] as didn't get off work until 5pm"); Tr. 596 (working maintenance/custodial 50 hours a week); Tr. 575 ("working hard").  And the ALJ did not find Cook to be "pain free"; rather, he limited him to a reduced range of light work due to his impairments.

Cook complains that the ALJ commented that his physical therapist wrote that Cook denied physical therapy had provided any relief and yet his Oswestry score had improved from 66 to 52.[2]  Doc. 14, p. 19.  He submits that, according to the Oswestry Back Pain Disability

---

[2] The Owestry Disability Index is a self-administered questionnaire in which patients score their pain on a 0–5 scale.  A lower score indicates less pain.  See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2647244/.

Index, "improvement does not actually mean that Mr. Cook is pain-free or even markedly improved" because "score of 41 to 60 indicates 'severe disability' with pain as the main problem, and that activities of daily living are affected by the pain."  Doc. 14, p. 19.  However, Cook agrees that his Oswestry pain score improved.  The ALJ's finding that there was an inconsistency between Cook's report that he had no relief from physical therapy and his improved Oswestry pain score which indicated that he did have improvement from physical therapy is accurate.

Moreover, the ALJ did not violate the Appeals Council's remand order.  Doc. 14, pp. 17-19.  The Appeals Council's remand order instructed the ALJ to "further evaluate the claimant's alleged symptoms and provide rationale in accordance with the disability regulations pertaining to evaluation of symptoms."  Tr. 488.  The ALJ evaluated Cook's alleged symptoms and provided rationale in accordance with the regulations, as detailed above.  The ALJ's evaluation in the decision at issue in this case is far more thorough than his evaluation in his prior decision. Tr. 15.  Thus, he complied with the remand order.

Cook asserts that the remand order contained a discussion indicating that the ALJ did not explain his why he found Cook to be non-compliant with treatment when he requested an increased Oxycodone prescription and did not indicate whether Cook's overmedicating could have supported his complaints of significant pain or could have implied an addiction issue.  Doc. 14, p. 17; Tr. 487.  First, the Appeals Council's discussion of the ALJ's first decision (Tr. 487) was not part of the actual remand order (Tr. 488).  Next, the ALJ explained, in the instant decision under review, how he treated that evidence.  He stated that the fact that Cook requested more pain medication, and Dr. Morley subsequently denied increasing his pain medication, was indicative of Dr. Morley finding that Cook's dosage was at the optimal level for his impairments. Tr. 437.  The ALJ also commented that Cook received the same dosage for years and regularly

reported that it helped him function.  Accordingly, the ALJ did not violate the Appeals Council's remand order.

### 4. The ALJ did not err when evaluating the opinion evidence

Cook argues that the ALJ erred when he evaluated the opinion evidence.  He objects that the ALJ gave "significant" weight to two state agency reviewing physicians' opinions from 2013 but discounted the opinion of his treating physician limited him to sedentary work.  Doc. 14, pp. 21-22.

First, there is no treating physician opinion in the record limiting Cook to sedentary work. The only treating physician opinion in the record is that of Dr. Morley, who opined that Cook was limited to light work with restrictions remarkably consistent with the ALJ's.  See Tr. 227-232 (Dr. Morley's opinion limiting Cook to light work with up to 5 hours a day each for sitting, standing, and walking and each up to 30 minutes at a time without interruption; occasionally able to climb ramps and stairs, never climb ladders or scaffolds, frequently balance and stoop, occasionally kneel, crouch and crawl; and no exposure to unprotected heights); Tr. 437 (ALJ's RFC limiting Cook to light work with up to 4 hours a day each for sitting, standing, and walking, the ability to alternate positions every 30 minutes, occasionally push/pull with left lower extremity, no climbing ladders, ropes or scaffolds, occasionally climbing ramps and stairs and performing other postural maneuvers; and avoiding concentrated exposure to temperature extremes and dangerous machinery and heights).  Cook does not describe an error the ALJ made with respect to Dr. Morley's opinion; his argument fails.

Finally, an ALJ may rely on state agency reviewing physicians' opinion even when the reviewing physicians did not review all the medical records, so long as the ALJ did review the later records.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 513 (6th Cir. 2010) (an ALJ does not

err when she relies on state agency reviewing opinions based on an incomplete record when the ALJ considers the complete record).  Here, the ALJ reviewed Cook's later records.  Cook has not described an error by the ALJ; his argument fails.

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED.**

Dated: May 17, 2021

/s/Kathleen B. Burke
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).